IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PATTERSON-UTI DRILLING COMPANY, LLC f/k/a PATTERSON-UTI DRILLING COMPANY, LP, LLLP,<br><br>    Plaintiff,<br><br>vs.<br><br>TRI-STATE TRUCKING, LLC; MB CONSTRUCTION SERVICES, INC; MIKE BRADY CORPORATION; and SUNLAND CONSTRUCTION, INC.,<br><br>    Defendants. | **MEMORANDUM, DECISION, AND ORDER**<br><br><br><br>Case No. 2:09-cv-01045<br><br>Judge Dee Benson |

Before the Court is Defendant Tri-State Trucking, LLC's ("Defendant") Motion for Summary Judgment based on the Economic Loss Rule as to Plaintiff Patterson-UTI Drilling Company's ("Plaintiff") Complaint. Defendant makes the motion pursuant to Federal Rule of Civil Procedure 56 and DuCiv R.7.1. The sole issue before the Court is whether the economic loss rule bars recovery in a negligence action between two parties in the oil industry who do not share a direct contractual relationship. The Court heard oral argument on this matter on April 23, 2012.

1

## I.  FACTS

This matter arises from an accident that occurred on November 27, 2006, during which a large piece of drilling equipment (the "Substructure") owned by Plaintiff, and leased by non-party Bill Barrett Corporation, was damaged while being transported by Defendant from one well site to another.  (Def.'s Mem. Supp. Mot. Summ. J. 1 (Dkt. No. 74)).

Bill Barrett Corporation is the owner of drilling rights over numerous properties.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 8 (Dkt. No. 85)).  As owner of the rights, Bill Barrett Corporation enters into contracts with oil field service providers to assist the corporation in the exploration of oil and gas.  *See id.* at 7-9.  On January 5, 2006, Bill Barrett Corporation entered into a standard-form contract with Plaintiff that obligated Plaintiff to drill designated wells for the benefit of Bill Barrett Corporation (the "Daywork Contract").  *See id.* at 7; Daywork Contract at 1, Ex. A (Dkt. No. 74-1).  Pursuant to the Daywork Contract, Plaintiff was to furnish a drilling rig.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 8 (Dkt. No. 85)).  The Substructure at issue was a part of the drilling rig.  *Id.*  Also pursuant to the Daywork Contract, Bill Barrett Corporation was to provide for the transportation requirements of Plaintiff's drilling rig, including the Substructure.  *Id.*

Defendant is a trucking company that specializes in the transportation of drilling rigs in the Rocky Mountain region.  *Id.* at 11.  Bill Barrett Corporation contracted with Defendant on November 11, 2005, pursuant to a standard-form Master Service Contract ("MS Contract") to perform services at various wells as requested by Bill Barrett Corporation.  *See id.* at 8; MS Contract, Ex. B (Dkt. No. 74-2).  The MS Contract does not specifically delineate what services and/or goods Defendant is to provide.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 8 (Dkt. No. 85)).

Plaintiff and Defendant did not have a contract with each other in connection with the transportation of the Substructure. *Id.* at vi.

Pursuant to the MS Contract, Bill Barrett Corporation asked Defendant to move the Substructure from one well-site to another. *See id.* at 10. Defendant elected to transport the Substructure in one piece rather than breaking it into four separate pieces. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 10 (Dkt. No. 85)). The Substructure was forty-five feet long, twenty feet high, twenty-four to twenty-six feet wide, and weighed 210,000 pounds. *Id.*

At the time of transport, the Substructure was suspended between two trucks, one driving forward and the other driving backward. *Id.* The Substructure was the only piece of the drilling rig that was moved with one truck driving forward and one truck driving backward. *Id.* at 12. The driver of the rear-facing truck lost control of the truck, causing the truck and the Substation to roll down the side of a hill. (Def.'s Mem. Supp. Mot. Summ. J. 2 (Dkt. No. 74)). The Substructure rolled at least three times before it stopped some 150 feet down the hill. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 10-11 (Dkt. No. 85)).

As a result of the accident, Plaintiff alleges that it "suffered significant property damage and resulting loss of use and lost employee time, and other consequential damages." *Id.* at v. Plaintiff brought suit against Defendant for negligence, and is seeking damages of approximately one million dollars. (Def.'s Mem. Supp. Mot. Summ. J. 2 (Dkt. No. 74)). Defendant alleges Plaintiff's claim against it is barred by the economic loss rule.

## II.  STANDARD OF REVIEW

### A.  SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997).  A court considering summary judgment should consider the evidence in the light most favorable to the non-moving party.  *See, e.g.*, *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004).

### B.  ECONOMIC LOSS RULE

"The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care."  *Hermansen v. Tasulis*, 48 P.3d 235, 239 (Utah 2002).  The rule serves two purposes: "[f]irst, it bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury.  Second, the economic loss rule prevents parties who have contracted with each other from recovering beyond the bargained-for-risks."  *Sunridge Dev. Corp. v. RB & G Eng'g, Ind.,* 230 P.3d 1000, 1006 (Utah 2010) (citations omitted).

### III. ANALYSIS

The economic loss rule was adopted and applied to "promote the obligations and expectations created by contract . . . ." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Pilgrims Landing, LC*, 221 P.3d 234, 243 (Utah 2009). Yet both parties agree that a contractual relationship does not exist between Plaintiff and Defendant: Plaintiff independently contracted with Bill Barrett Corporation, and Defendant independently contracted with Bill Barrett Corporation, but Plaintiff and Defendant did not contract with each other regarding the transportation of the Substructure. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. vi (Dkt. No. 85); Def.'s Mem. Supp. Mot. Summ. J. 2-4 (Dkt. No. 74)).

To circumvent this fact, Defendant asks the Court to adopt the rationale set forth in construction industry cases wherein courts have utilized the economic loss rule to bar recovery between parties that do not have a direct contractual relationship. *See Davencourt*, 221 P.3d at 243. Attempting to use Bill Barrett Corporation as a lynchpin that holds the parties' separate contracts with Bill Barrett Corporation together, Defendant alleges that because "[c]onstruction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations," and the oil industry is likewise characterized by detailed and comprehensive contracts that form the foundation of the oil industry, the Court should also apply the economic loss rule in this case. *See* Def.'s Mem. Supp. Mot. Summ. J. 5-7 (Dkt. No. 74).

After reading the parties' memoranda and having considered the positions of the parties presented at oral argument, the Court finds that Defendant has not demonstrated that the facts in the present case are sufficiently analogous to the construction cases that it cites. Defendant also fails to demonstrate that Plaintiff's Daywork Contract with Bill Barrett Corporation contains

5

terms that implicate Defendant in a cause of action. The Court thus denies Defendant's motion for summary judgment based on the analysis below.

### A. Plaintiff Alleges Damages from Negligence – Not a Defective Product

The first issue the Court addresses is whether the construction cases cited by Defendant are sufficiently analogous to the present case for the purpose of applying the economic loss rule.

Both Plaintiff and Defendant acknowledge that the economic loss rule has its roots in product liability cases. *See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 13 (Dkt. No. 85); Def.'s Mem. Supp. Mot. Summ. J. 6 (Dkt. No. 74). These cases follow the reasoning that consumers do not have negligence claims against manufacturers simply because a product did not perform to the standard that the consumer thought the product should perform. *See American Towers Owners Ass'n, Inc. v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1190 (Utah 1996). Both parties also acknowledge that the economic loss rule has been expanded to apply in defective design and construction cases as well. *See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 13 (Dkt. No. 85); Def.'s Mem. Supp. Mot. Summ. J. 6 (Dkt. No. 74).

In the majority of cases in Utah where the economic loss rule has been applied – and in the cases cited by Defendant in support of its motion – there is some allegation that the object at issue was "defective": i.e., the design of a product or the construction of a building was defective or of inferior quality. *See, e.g.*, *SME Industries, Inc. v. Thompson, Ventulett, Stainback & Associates, Inc.*, 2001 UT 54, ¶ 38, 28 P.3d 669. At their core, these cases implicate products that did not work for the general purpose for which the product was manufactured. *See, e.g., Sunridge Dev. Corp. v. RB & G Eng'g Inc.*, 2010 UT 6, ¶ 28, 230 P.3d 1000; *Hermansen v. Tasulis*, 2002 UT 52, ¶ 20, 48 P.3d 235; *Davenport* 2009 UT 65 at ¶ 25, 221 P.3d at 234.

But a defective product, design, or construction is not at issue in this case. Plaintiff is not alleging property damage stemming from the design, construction, sale, or repair of the Substructure. Nor is Plaintiff claiming that there was a defect in the Substructure or that the Substructure did not work for the general purposes for which it was manufactured, constructed or sold. Plaintiff is alleging Defendant negligently damaged its property while in the process of transporting it, an allegation entirely distinguishable from the defective product and defective construction cases cited by Defendant.

For example, in *SME Industries,* cited by Defendant, a subcontractor brought an action against an architectural services company and design team for delay damages and breach of contract after the subcontractor encountered problems with the structural steel portions of the plans and specifications prepared by the design team. *SME Industries, Inc.*, 2001 UT 54 at ¶¶ 2-5, 28 P.3d at 672-73. The subcontractor sought recovery of extraordinary costs in excess of two million dollars. *Id.* The Supreme Court of Utah held the economic loss rule applies in barring a contractor and subcontractor's negligence claim against a design professional such as an architect or engineer. *Id.* at ¶ 38, 28 P.3d at 682.

Unlike the plaintiff in *SME Industries*, however, Plaintiff is not alleging that the construction or design of the Substructure was defective. Rather, Plaintiff is alleging that Defendant negligently damaged its Substructure while transporting it. The allegations in these cases are thus distinguishable. As the *SME Industries* court stated: "the gravamen of SME's negligence claims is dissatisfaction with the plans and specifications by the design team. Indeed, SME acknowledges that its tort claims seek purely economic damages, unaccompanied by any claim of . . . damage to other property." *Id.* at ¶ 45, 28 P.3d at 684. Conversely, the gravamen of

7

Plaintiff's claim is that Defendant damaged its property – the Substructure. Defendant's plans or specifications regarding the Substructure – if there were any – are not at issue in this case.

A more analogous case in which the economic loss rule was held inapplicable is the Texas Supreme Court case cited by Plaintiff, *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011). In *Sharyland*, the Defendant city of Alton contracted with Plaintiff Sharyland Water Supply. *Id.* at 410. Under the terms of the contract, Alton conveyed its water system to Sharyland. *Id.* In return, Sharyland provided potable water to Alton residents and maintained the water system. *Id.* Some twenty years later, Alton hired an independent contracting company to build a sanitary sewer system for the city. *Id.*

Sharyland brought suit against Alton and the contracting company, alleging that the sewer system was negligently installed in violation of state regulations and industry standards because the location of the sewer lines to the water system threatened to contaminate Sharyland's potable water supply. *Id.* In its defense, the contracting company relied on construction cases to argue that the economic loss rule should apply in barring Sharyland's claim. *Id.* at 420. The Texas Supreme Court, however, rejected the economic loss rule as a bar to Sharyland's claim, specifically noting that, "[c]onstruction defect cases . . . usually involve parties in a contractual chain who have had the opportunity to allocate risk, unlike the situation faced by Sharyland." *Id.*

As in *Sharyland*, where two parties separately contracted with third party city of Alton, Plaintiff and Defendant separately contracted with third party Bill Barrett Corporation to perform independent obligations under their respective contracts. *See* Pl.'s Mem. Opp. Def.'s Mot. Summ. J. vi (Dkt. No. 85); Def.'s Mem. Supp. Mot. Summ. J. 2-4 (Dkt. No. 74). Like

*Sharyland*, Defendant alleges that the parties' individual contracts with third party Bill Barrett Corporation make application of the economic loss rule appropriate because the economic loss rule has been previously utilized in construction contract cases. *See* Def.'s Mem. Supp. Mot. Summ. J. 5-7 (Dkt. No. 74). And, as with *Sharyland*, this Court holds the economic loss rule does not apply. The *Sharyland* court ruled that neither Sharyland's agreement with Alton, nor Alton's separate contract with its contractor defeated Sharyland's negligence claim against Alton's contractor. *Sharyland*, 354 S.W.3d at 419-20. This Court is likewise persuaded that neither Plaintiff's contract with Bill Barrett Corporation, nor Defendant's separate contract with Bill Barrett Corporation will defeat Plaintiff's claim against Defendant.

Plaintiff, like the plaintiff in *Sharyland*, did not have the opportunity along the contractual chain to allocate risk as is usually the case in construction defect claims. The underlying policy consideration for applying the economic loss rule is to "prevent parties who have contracted with each other from recovering beyond the bargained-for risks." *SME Industries, Inc.*, 2001 UT at ¶ 32. Defendant has not presented any evidence that Plaintiff and Defendant were able to bargain for risks concerning transportation of the Substructure with each other. Because there was no opportunity for Plaintiff and Defendant to bargain for risk, the economic loss rule is inapplicable.

In addition, merely because the object of the negligent performance – the Substructure in the present case – "was the subject of a contract does not mean that a contractual stranger is necessarily barred from suing a contracting party for breach of an independent duty." *Sharyland*, 354 S.W.3d at 419-20; *see also Wolf Hollow I L.P. v. El Paso Marketing, L.P.*, 329 S.W.3d 628 (Tex. Ct. App. 2010) (holding "[o]ne who undertakes to perform a contract assumes a duty to all

persons to take reasonable care not to injure them or their property in the performance of that contract, and one who is not privy to the contract may assert a claim for negligence for breach of that duty . . . .") If such were the case, a party could avoid tort liability to the world simply by entering into a contract with one party on anything related, no matter how tenuously, to that contract. *See id.*

Because both parties agree that the parties did not maintain a contractual relationship, and having distinguished Defendant's cited construction cases from the present case, the Court now addresses the issue of whether the terms of Plaintiff's Daywork Contract with Bill Barrett Corporation implicate Defendant in a cause of action.

### B.  The Terms of The Daywork Contract Do Not Implicate Defendant

Defendant also seeks to invoke the economic loss rule based on the assumption that Plaintiff, Defendant, and Bill Barrett Corporation have allocated their respective risks, liabilities, and obligations in their respective contracts such that Defendant is relieved of any tort liability. *See* Def.'s Mem. Supp. Mot. Summ. J. 7 (Dkt. No. 74) ("Given the extensive contractual relationships, all of which flow between the contractors and Bill Barrett Corporation, the pervasive contractual controls and the detailed obligations and limitations flowing from the various contracts, the economic loss rule applies as a matter of law . . . ."). As Plaintiff correctly points out, however, none of these allocations are evidenced in the Daywork Contract between Plaintiff and Bill Barrett Corporation. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 15 (Dkt. No. 85)).

Defendant relies on the exculpatory and indemnity provisions found in Paragraph 14 of the Daywork Contract between Plaintiff and Bill Barrett Corporation to imply that the responsibility for loss or damage, indemnity, release of liability and allocation of risk were

10

intended to encompass the rights and obligations of Plaintiff and Bill Barrett Corporation *and any* third-party independent contractors such as Defendant. *See id.*; Def.'s Mem. Supp. Mot. Summ. J. 6-7 (Dkt. No. 74). The unambiguous language of the Daywork Contract, however, contradicts Defendant's position and clearly provides that the risk allocation, exculpatory and indemnity provisions apply *only* to Plaintiff and Bill Barrett, the parties to the Daywork Contract.

Subsection 14.13 is particularly telling. Section 14.13 specifically provides:

> . . . such indemnification and assumption of liability [contained in Paragraph 14] *shall not be deemed to create any rights to indemnification in any person or entity not a party to this contract*, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

*Id.*; Daywork Contract at 6, Ex. A (Dkt. No. 74-1) (emphasis added)). The economic loss rule applies to contracts that govern the issue in question. When an issue is covered by contract, then that issue is taken out of the contract via the economic loss rule. But there is nothing in the Daywork Contract that governs the consequences of Defendant's alleged negligence in transporting the Substructure. On the contrary, Subsection 14.13 clearly demonstrates that Plaintiff and Bill Barrett Corporation fully intended to exclude the rights of third parties such as Defendant from the Daywork Contract. Because the economic loss rule applies to duties and rights created under a contract, and because any duties and rights implicating Defendant in the Daywork Contract not only do not exist but are affirmatively not granted to Defendant, the Court is unpersuaded by Defendant's argument that the economic loss rule applies in this case.

Defendant also alleges that the Utah Supreme Court has held that "[u]nder Utah law it

does not matter what the contracts provide. It is the existence of the contracts, *and the possibility of the contracts*, which triggers the economic loss rule." (Def.'s Reply Mem. Supp. Mot. Summ. J. 2 (Dkt. No. 90) (emphasis added)). In other words, Defendant argues, if there was merely the possibility that a term could have been included in a contract then the economic loss rule applies. The Court does not agree. First, Defendant has not provided any evidence to suggest that Plaintiff and Bill Barrett Corporation intended to grant – even as a possibility – rights to Defendant in the Daywork Contract. As demonstrated above, these rights were expressly not granted to third parties such as Defendant in the Daywork Contract. Second, the Court finds that Defendant's interpretation of the economic loss rule expands the rule farther than the Utah Supreme Court ever intended. Defendant's motion must be denied.

Because the Court decides Defendant's motion based on the inapplicability of the economic loss rule in this case, the Court does not reach the issues raised by Defendant regarding the common carrier exception to the economic loss rule or the independent duty of care exception to the economic loss rule.

## IV. CONCLUSION

Based on the analysis above, Defendant's Motion for Summary Judgment Based on the Economic Loss Rule is hereby DENIED.

IT IS SO ORDERED.

DATED this 29th day of May, 2012.

_____
Dee Benson
United States District Judge